UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ROBERTO CALLE GRACEY,                    :     **08 CV 6842**
individually and behalf of all other     :
persons similarly situated,               :     **ECF CASE**
                                          :
                    Plaintiff,            :     **CLASS ACTION COMPLAINT**
                                          :
        -against-                         :     **JURY TRIAL DEMANDED**
                                          :
OPTIVER US, LLC, OPTIVER HOLDING BV,      :
OPTIVER VOF, CHRISTOPHER DOWSON,          :
BASTIAAN VAN KEMPEN, RANDAL               :
MEIJER, AND JOHN DOES NOS. 1-10,          :
                                          :
                    Defendants.           :
---------------------------------------------------------------x

    Plaintiff complains of Defendants upon knowledge as to matters relating to Plaintiff and

upon information[1] and belief as to all other matters:

## SUMMARY OF ALLEGATIONS

    1.    Between March 2 and March 26, 2007 inclusive ( the "Manipulated Period"),

Defendants (*see* ¶¶ 18 – 24 *infra*) manipulated prices of New York Mercantile Exchange

("NYMEX") (1) light sweet crude oil futures contracts, (2) heating oil futures contracts, and

(3) gasoline futures contracts in violation of Sections 9(a) and 22(a) of the Commodity

Exchange Act (the "CEA" or the "Act"), 7 U.S.C. §§ 13(a) and 25(a), as well as New York

common law.

Defendants' manipulation was accomplished pursuant to a "bully the market" strategy developed
earlier in 2007 by Defendants Optiver US, LLC ("Optiver"), Optiver

---

[1] Plaintiff's information is based upon the investigation of counsel including but not limited to an
analysis of the complaint by the Commodity Futures Trading Commission ("CFTC") For
Injunctive And Other Equitable Relief And Civil Monetary Penalties Under The Commodity
Exchange Act, S.D.N.Y. Index No. 08 Civ. 6560 (LAP) against each of the Defendants named
herein (the "CFTC Complaint").

Holding BV ("Optiver Holding"), and Optiver VOF ("Optiver VOF"), the United States and Netherlands branches of a global proprietary trading fund headquartered in the Netherlands.

     3.    The "bully the market" strategy involved (1) acquiring large positions in a futures contract, and (2) liquidating those positions in a compressed period of time during the last minutes before the close of trading.

     4.    The customs and standards in commodity futures trading are that this "bully the market" strategy constitutes a classic manipulative act known variously as "banging the close", "marking the close" or "painting the tape".

     5.    Defendants' extensive emails and recorded telephone conversations self-describe such strategy and Defendants' associated conduct as efforts to "hammer," "influence," "push," "move," "whack," and "bully" the prices of NYMEX futures contracts.

     6.    Contrary to these internal e-mails and recorded telephone conversations, Defendants falsely represented to NYMEX compliance that Defendants were engaged in innocent trading.

     (a)    On or about March 19, 2007, NYMEX officials sent a Compliance Advisory, which was forwarded to Defendant van Kempen by Fortis Clearing Americas, reminding that "misuse of TAS . . . trades to acquire a position in order to unfairly effect or attempt to unfairly effect a settlement price subject [*sic*] the member and/or the customer to disciplinary action for any of a number of rule violations including but not limited to attempted price manipulation. . . ."

     (b)    On or about March 26, 2007, Optiver and van Kempen falsely stated in response to questions from NYMEX compliance that "what we're trying to do is just make markets in the TAS contract and hedge ourselves as well as

possible during that closing period and maybe slightly before. But you gotta

do it before 1:30 'cause afterwards liquidity dries up completely."

(c) Optiver and van Kempen thereby willfully falsified, concealed and covered up

a material fact or made false, fictitious or fraudulent statements or

misrepresentations in violation of Section 9(a)(4) of the Act, 7 U.S.C. §

13(a)(4).

(d) In or about the first week of April 2007, Optiver stopped its practice of

recording its telephone lines.

7.    The foregoing fraudulent conduct by Defendants is alleged in order to

demonstrate that they knew that the classic manipulative act of "marking the close" in which

they had been engaging, was unlawful manipulation. Accordingly, they sanitized and

eliminated from their communication with the NYMEX the descriptive verbs "push" and

"influence" and "hammer prices". Although Defendants had been using these verbs in their

internal communications, they tried to create wholly different reasons that might be

acceptable to the regulators for what Defendants had known to be their classic manipulative

conduct.

8.    Defendants employed this "bully the market" manipulative strategy in the

following NYMEX futures contracts and on the following dates:

   (a) crude oil future contracts:        March 6, 14, 15, 16 and 19;

   (b) heating oil futures contracts:     March 9, 13, 19, and 20; and

   (c) gasoline futures contracts:        March 2, 6, 8, 9, 13, 14, 15, 16, 19, and 21.

9.     The three functions of commodity futures trading which rescue it from its former status as illegal gambling contracts[2] are (1) hedging and risk transfer (2) reducing volatility of price movements and (3) price discovery. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971).

10.     Defendants' manipulative act of "banging the close" increased rather than decreased volatility and was calculated to do so. Defendants' manipulative act did not transfer any risks; on the contrary, such conduct created additional risks by causing prices to move out of line. Such manipulative conduct did not represent price discovery. Rather, Defendants were seeking to move prices and achieve a pre determined **distortion** in prices in order to generate a self-fulfilling prophecy type of profit. Defendants were **not** making a transaction based on the expectation of what the fundamentals or normal pricing was going to be.

11.     Plaintiff's manipulation claim is based upon Defendants' calculated "market power" and the resulting consequences of that market power under the CEA. *See In re Global Minerals & Metals Corp.*, 1999 WL 1023586, fn. 51 (C.F.T.C. Nov. 12, 1999) ("Manipulation law is essentially a facet of antitrust law. After all, manipulation is an example of an illegal restraint on trade"). Defendants specifically calculated their manipulative strategy to secure the size of positions that would create the necessary ability to influence and control prices.

12.     As a direct result of Defendants' manipulation, Plaintiff and Class members were injured including by being deprived of a competitive market free of manipulation and

---

[2] *See Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 56 (5th Cir. 1962) ("a commodity exchange which did not require a short to deliver at maturity would be a gambling institution") (quoting amicus brief of N.Y. Cotton Exchange).

by losing money on their trades in the subject contracts. Under Section 22(a) of the CEA, Defendants are responsible for the damages that they caused Plaintiff and Class members. Under New York common law restitutionary principles, Defendants are liable to make good to Plaintiff and Class members for their losses arising from Defendants' unlawful acts.

## JURISDICTION AND VENUE

13.    Light sweet crude oil, heating oil, and gasoline each are "commodit[ies]" and the "commodit[ies] underlying", respectively, NYMEX crude oil futures, heating oil futures and gasoline futures, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25.

14.    Jurisdiction lies in this Court under Section 22 of the CEA, 7 U.S.C. §§ 1, *et seq.*, 28 U.S.C. §§ 1331 and 1337.

15.    Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), because each of the Defendants transacts business in the Southern District of New York and the claims arose in the Southern District of New York. The conduct described herein has been carried out, in part, within the Southern District of New York. Defendants' unlawful acts manipulated the prices of NYMEX natural gas futures and options which were traded in this district in which NYMEX is located, at One North End Avenue, New York, New York.

16.    Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of transportation or in communication, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

**Plaintiff**

17.     (a) Plaintiff Roberto E. Calle Gracey ("Gracey"), a natural person residing in Madrid, Spain, purchased or sold April 2007 NYMEX crude oil futures contracts during the Manipulated Period by making trades on each of the following dates:  March 2, 6, 7, 8, 13, 14, 15, and 16, 2007.  Plaintiff Gracey lost approximately $6,975 during the Manipulated Period in such NYMEX April 2007 Contract transactions.

(b) Plaintiff Gracey also purchased or sold May 2007 NYMEX crude oil futures contracts during the Manipulated Period by making such trades on each of the following dates:  March 20, 21, 22, and 26.  Plaintiff Gracey lost approximately $1,800 during the Manipulated Period in such NYMEX May 2007 crude oil futures contracts.

(c) Gracey was injured by reasons of Defendants' manipulation which deprived Gracey and Class members of a competitive market in NYMEX crude oil futures contracts.   *See* ¶¶ 72-73 and 79 *infra*.  Defendants are liable to Gracey for his damages from the manipulation and to make restitution for his losses caused by their unlawful conduct.  *See* ¶¶ 76-95 *infra*.

**Defendants**

18.     Defendant Optiver is an Illinois company with its principal place of business at 130 E. Randolph Street, Suite 1300, Chicago, IL  60601.  Optiver trades commodity futures, options on commodity futures, stocks and stock options listed on organized U.S. exchanges, including NYMEX and the New York Stock Exchange.  Optiver is a wholly owned subsidiary of Optra Curacao, which is wholly owned by Optiver Holding.

19.    Defendant Optiver Holding is a Netherlands corporation with its principal place of business at De Ruyterkade 112, 1011 AB Amsterdam, The Netherlands. Optiver Holdings engages in trading activity through its subsidiary companies, including Optiver and Optiver VOF, and manages the activities of its subsidiary companies, including Optiver and Optiver VOF, through its Global Management Board (the "Global Management Board"). In practice, two-thirds of the profits of Optiver and Optiver VOF are distributed to Optiver Holding, with the remaining one-third distributed among the other partners of Optiver VOF.

20.    Defendant Optiver VOF is a Netherlands general partnership with its principal place of business at De Ruyterkade 112, 1011 AB Amsterdam, The Netherlands. Optiver VOF is comprised of various partners, including Optiver Holding (through its wholly owned subsidiary Optiver BV), and Defendants Dowson, Meijer and van Kempen (through their wholly owned companies, respectively Cobblestones LLC, Randal Derivatives BV, and Platinum Options BV).

21.    Defendant Dowson is a natural person and a citizen of the United Kingdom, currently residing in Chicago, Illinois. Dowson began at Optiver VOF in September 2000 as an equities trader, and in or about January 2007 moved to Chicago and became Head of Trading for Optiver, responsible for Optiver's trading of, among other things, commodity futures contracts, including NYMEX crude oil futures. For 2007, Dowson received approximately $100,000 in U.S. salary and approximately €1,700,000 based on his share in the Optiver VOF partnership.

22.    Defendant Van Kempen is a citizen of The Netherlands, currently residing in Chicago, Illinois. Van Kempen began at Optiver Holding in or about October 1998 as a

trader and later a director, and moved to Chicago in or about 2001 to head the newly opened

Chicago office. Van Kempen became Chief Executive officer of Optiver in 2003 and has

maintained that office to the present. Together with Dowson, van Kempen jointly managed

Optiver at all relevant times. For 2007, van Kempen received approximately $55,000 in

U.S. salary and approximately USD $1,600,000 based on his share in the Optiver VOF

partnership.

23.     Defendant Meijer has at all relevant times been Head of Trading, supervising

the trading activity of each of Optiver Holding's subsidiaries, including Optiver and Optiver

VOF. Meijer is one of five members of Optiver Holding's Global Management Board,

which oversees Optiver, Optiver VOF and other affiliated entities. For 2007, Meijer

received approximately €1,700,000 based on his share in the Optiver VOF and shareholder

dividends from Optiver Holding.

24.     Plaintiff alleges on information and belief that at all relevant times,

Defendants John Does 1-10, inclusive, were also engaged in the manipulation of crude oil

futures prices as alleged herein. Plaintiff is presently unaware of the true names and

identities of those Defendants sued herein as John Does 1-10. Any reference made to such

Defendants by specific name or otherwise, individually or plural, is also a reference to the

actions of John Does 1-10, inclusive.

## CLASS ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure ("FRCP") on his own behalf and as representative of a class

("Class") defined as all persons, corporations and other legal entities (other than Defendants,

their employees, affiliates and co-conspirators) that purchased or sold NYMEX crude oil

futures contracts, heating oil futures contracts, and gasoline futures contracts during the Manipulated Period (*i.e.*, March 2 – March 26, 2007).[3]

26.    FRCP Rule 23(a)(1).   Class members number in the hundreds or, perhaps, thousands, and are geographically dispersed such that joinder is impractical.

27.    FRCP Rule 23(a)(2).   Common issues of fact and law include but are not limited to:

(a) Whether Defendants' "bully the market" strategy constituted a manipulative or unlawful act;

(b) Whether Defendants injected into NYMEX futures contract trading illegitimate forces of supply and demand;

(c) Whether Defendants manipulated prices in violation of the CEA;

(d) Whether Defendants unjustly enriched themselves or are otherwise responsible for restitution under the common law;

(e) The fact and degree of impact on futures contract prices of Defendants' course of unlawful conduct; and

(f) The appropriate relief.

28.    Rule 23(a)(3).   Plaintiff's interests are typical of, and not antagonistic to the interests of, the Class.

29.    Rule 23(a)(4).   Plaintiff is an adequate class representative and has retained adequate counsel.

30.    Rule 23(b)(3).   Common issues predominate over individual issues (if any). A class action is superior to other methods (if any) for a fair and efficient adjudication of

---

[3] Plaintiff expressly reserves the right to amend the Class definition at the time of the motion for class certification or otherwise.

this case.  Indeed, a class action is the only method by which Plaintiff and the Class can efficiently seek redress because of "negative value" claims. The records of commodity futures traders are required to be maintained by futures commission merchants.  Plaintiff does not anticipate any difficulties in the identification of Class members, notice to Class members or other aspects of the management of this action as a class action.

## UNDERLYING ALLEGATIONS

### The Manipulated Contracts and Market

31.    The primary purpose of the CEA is "to deter and prevent price manipulation or any other disruptions to market integrity." 7 U.S.C. § 5.  Between March 2 and 26, 2007 Defendants disrupted the market integrity and unlawfully impacted prices of the subject futures contracts traded on the NYMEX, all in violation of the CEA.

32.    Commodity futures contracts are standardized agreements the form of which is created by the exchange on which the contract is traded.  The contract "long" is to purchase and the contract "short" is to sell the specified commodity for delivery in the future at a price that is determined at initiation of the contract.  Contracts may be satisfied by delivery or (more than 99% of the time) by liquidation.  That is, the "long" who originally purchased one contract would sell one contract, or the "short" who originally sold one contract would buy one contract.

33.    NYMEX has been designated a contract market by the CFTC pursuant to Section 5(b) of the CEA, 7 U.S.C. § 7(b), and Commission Regulations 38.3(a)(i), (ii) and (iii).  NYMEX submits to the CFTC for approval various rules and regulations through which NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options on futures contracts, including futures and options for natural gas.

34.    The NYMEX crude oil futures contract trades in units of 42,000 gallons (1,000 U.S. barrels) of West Texas Intermediate light sweet crude oil ("WTI"), and the delivery point is Cushing, Oklahoma.

35.    The price for the NYMEX crude oil futures contract is quoted in U.S. dollars and cents per barrel and the minimum price fluctuation (also known as one "tick") is $0.01 per barrel ($10.00 per contract).

36.    The NYMEX heating oil contract trades in units of 42,000 gallons (1,000 U.S. barrels) and is based on delivery in New York harbor, which is the principal cash market trading center.

37.    The price for the NYMEX heating oil contract is quoted in U.S. dollars and cents per gallon and the minimum price fluctuation (or one "tick") is $0.0001 (0.01¢) per gallon ($4.20 per contract).

38.    The NYMEX gasoline futures contract trades in units of 42,000 gallons (1,000 U.S. barrels) and is based on delivery at petroleum products terminals in the New York harbor.

39.    New York harbor gasoline is a wholesale non-oxygenated blendstock traded in the New York harbor barge market.

40.    NYMEX also permits Trading at Settlement contracts ("TAS contracts") in the subject futures contracts. TAS contracts are futures contracts in a specified commodity which are priced at the settlement price on a specified date plus or minus an agreed amount. TAS contracts are offset by an opposite trade in the corresponding NYMEX futures contract.

41.     The subject futures contracts and TAS contracts may be traded on the NYMEX trading floor by open outcry trading, from 9:00 AM until 2:30 PM, and may also be traded electronically on the CME/Globex platform ("Globex") from 6:00 PM the previous calendar day until 2:30 PM.

42.     NYMEX rules also permit, in certain circumstances, the subject futures to trade in a two-minute session after the close of trading (the "Post-Close").

43.     TAS contracts are available for trading for the front two months, *i.e.*, the upcoming delivery month and the following delivery month, except on the last day of trading for the underlying futures contract. During March 2007 those front two months were the April and May 2007 crude oil futures contracts, the April and May 2007 gasoline futures contracts, and the April and May 2007 heating oil contracts.

44.     TAS contracts are priced either at par (100 points) or based on a differential (plus or minus) from settlement in the underlying product. The maximum differential is 10 "points" or "ticks" from the settlement, *i.e.*, TAS contracts are traded in a range from 110 to 90. One point or tick in a TAS contract corresponds to the minimum price fluctuation in the underlying future. Because TAS contracts are priced according to the settlement price for the underlying futures, if a trader with a TAS position can successfully trade futures in the opposite direction, such that the average price of its futures trades is equal to the final settlement price, the price of the futures trades would equal the price of the TAS trades, adjusting for any differential.

45.     A trader buying and selling TAS contracts can make a profit equal to the differential, a practice known as "scalping."

46.    A trader can also profit by selling TAS contracts for a premium (101 or above) or buying at a discount (99 or below) and subsequently trading futures contracts in the opposite direction for an average price equal to or better than the settlement price.

47.    Pursuant to NYMEX rules, the settlement price of futures contracts is established by the NYMEX settlement committee at the close of each trading session as the official price to be used by the clearinghouse in determining net gains or losses, margin requirements, and the next day's price limits.

48.    In accordance with NYMEX rules and procedures, at all relevant times the settlement price for the crude oil futures contract, the gasoline futures contract, and the heating oil contract were derived by calculating the volume weighted average of the prices ("VWAP") at which trades were conducted during the Close, *i.e.*, from 2:28 to 2:30 PM.

49.    The price of the crude oil, heating oil, and gasoline futures contracts are related such that the movement of the price of one contract can and often does cause movements of another contract.

### Details of the Unlawful Conduct

50.    In or about January 2007, Optiver under Dowson's direction began trading TAS contracts for crude oil, heating oil and gasoline.  By February 2007, Defendants had developed their manipulation strategy.

51.    The Defendants accumulated a large net long or short TAS position in the subject commodity future (*e.g.*, crude oil).

52.    Beginning at or about 6PM, when a new session of TAS trading began on NYMEX, Defendants began entering orders for TAS contracts for the following day,

13

placing a series of orders to buy TAS contracts at a range of prices and a series of orders to sell an approximately equal number of TAS contracts also at a range of prices.

53.    The Globex system operated on a "first in, first out" basis. This means that bids and offers quoted at the same price would be executed based on the order in which they were entered into the system. However, an offer to sell at a lower price, or to buy at a higher price, would be placed by the Globex system in line for execution ahead of pre-existing orders at less favorable prices.

54.    To ensure that their orders were first in the queue, Defendants used an Excel spreadsheet which had been developed for Defendants to work with the Eccoware system Defendants used to place their orders on Globex. The program was designed to rapidly enter a series of orders into Globex and was referred to by Defendants as the "Hammer."

55.    Typically, few trades were executed overnight and Defendants' TAS trades would take place the following day. Throughout the trading day, Dowson or other traders under his direction would adjust Defendants' orders – canceling or modifying existing orders and placing new ones – often thereby increasing Defendants' net long or short TAS position in a manner that resulted in Defendants accumulating a net long or short TAS position.

56.    By approximately 2:25 PM, Defendants typically had accumulated a large net long or short position in TAS contracts for crude oil, heating oil and/or gasoline.

57.    Beginning at approximately 2:25 up until 2:27:59 PM (the "Pre-Close"), Defendants typically executed 20-30% of the futures trades called for under Defendants' manipulative scheme.

58.    Defendants' intended for their Pre-Close trades to begin driving the price of crude oil, heating oil and/or gasoline futures in a certain direction.

59.    Defendants' ultimate goal was to ensure that there would be a significant and favorable price differential between the futures contracts Defendants traded during the Pre-Close and the settlement price, which would, in turn, determine the value of Defendants' TAS position.

60.    Because the futures contracts traded directly offset the TAS contracts, if Defendants could trade 20-30% of their futures contracts during the Pre-Close for a price more favorable than the settlement price and trade the remaining 70-80% of their futures contracts, during the Close, for a weighted average price close to the settlement price, Defendants would achieve a significant profit overall.

61.    According to Meijer, the Defendants' manipulative scheme was all "built on the idea that we can **control** the VWAP" [value weighted average price], this is, control the prices that make the average.

62.    Because the settlement price is equal to the VWAP during the Close, Defendants wanted to ensure that their trades during the Close were executed at an average price close to or more favorable than the VWAP.

63.    During the Close, Defendants intended to execute approximately 60% of their planned trades of futures contracts within the first minute and the remaining 40% in the second minute.

64.    All of Defendants' futures contracts trades during the Pre-Close and the Close were entered into Globex by traders under the supervision of Dowson and Meijer.

65.    Defendants maintained a software program developed in-house which processed information about prices and quantities of trades being executed and showed a running calculation of the VWAP during the Close.

66.    Van Kempen controlled Optiver. His responsibilities included supervising the Compliance, Risk Management, Human Resources and IT Departments. Together with Dowson and Meijer, van Kempen determined the amount of bonuses to be given to Optiver's traders. Van Kempen was at all relevant times responsible for the annual compliance meeting and for ensuring adherence to Optiver's compliance manual. Under the immediate direction of Dowson, van Kempen was involved in the development of the TAS trading strategy, and he directly supervised Optiver's traders when Dowson was away.

67.    Dowson controlled Optiver. His responsibilities included Optiver's trading decisions and strategies, including directing and supervising the TAS trading strategy, and hiring, firing and reviewing the performance of traders

68.    Meijer controlled Optiver. His responsibilities as a member of the Global Management Board included the appointment of Dowson as head trader in Chicago and setting the risk limits for Defendants' manipulative scheme. Meijer directly participated in the development and supervision of the manipulative scheme; Dowson's authority to implement the manipulative strategy was subject to Meijer's approval. Van Kempen and Dowson regularly reported to Meijer on matters of trading and compliance, including at regular weekly telephone conferences.

69.    All trades during the Pre-Close and Close were entered into by Globex under the supervision of Dowson and Meijer.

70.     In response to the previously alleged inquiry by NYMEX compliance into abuses of TAS contracts (*see* ¶6 *supra*) Defendants ended their manipulative strategy.

71.     Defendants' build up of the manipulative positions, compressed liquidation of such positions, and associated manipulative trades all introduced factors of demand and supply that were illegitimate, manipulative, and extraneous to the legitimate supply and demand factors in the market.

72.     Such trades and positions that were extraneous to legitimate supply and demand had an impact on prices and caused prices to be different than they would have been in a lawful, competitive market free of Defendants' manipulative strategy and repeated manipulative trades.

73.     Although the CFTC elected to charge only attempted manipulation in respect of some of Defendants' manipulative acts, the CFTC has historically, in order to avoid economist bills and simplify trial work, charged only attempted manipulation rather than actual manipulation.  Based on fundamental economic principles of supply and demand, Plaintiff alleges that Defendants' manipulative acts, individually and in the aggregate, did cause the subject futures contract prices to be different than they would have been in a competitive, lawful market, *i.e.*, artificial.

74.     Although the precise ascertainment of Defendants' net effect on prices is difficult, Defendants engaged in substantial manipulative acts, unlawfully had an effect on prices, violated multiple legal prohibitions, and are responsible for the loss or damages of Plaintiff and Class members.

75.     The cumulative effect of Defendants extensive manipulative conduct caused prices to be not reflective of legitimate supply and demand factors not only at the time that

Defendants made their trades but for all or substantial parts of the remainder of the

Manipulated Period as well.

## AS AND FOR A FIRST CLAIM FOR
## MANIPULATION AND ATTEMPTED MANIPULATION IN VIOLATION OF THE
## COMMODITY EXCHANGE ACT
### (7 U.S.C. § 1, *et seq.*)

76.     Plaintiff incorporates by reference and re-alleges the preceding allegations as

though fully set forth herein.

77.     By their conduct, the Defendants each violated Sections 9(a)(2) of the Act, 7

U.S.C. § 13(a)(2) and caused prices of NYMEX crude oil, heating oil and gasoline futures

contracts to be artificial during the Manipulated Period.

78.     Defendants' trading and other activities alleged herein constitute market

power manipulation of the prices of NYMEX crude oil, heating oil and gasoline futures

contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

79.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and

other traders of a lawfully operating market during the Class Period.

80.     Plaintiff purchased and sold NYMEX crude oil futures contracts during the

Manipulated Period, lost monies, and was injured as a result of the Defendants'

manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, et seq.

81.     Plaintiff and the Class are each entitled to damages for the violations of the

CEA alleged herein.

## AS AND FOR A SECOND CLAIM FOR
## AIDING AND ABETTING AND CONTROL PERSON LIABILITY FOR
## MANIPULATION

82.     Plaintiff incorporates by reference and re-alleges the preceding allegations as

though fully set forth herein.

83.    To any extent that any Defendant is not liable under the first claim for relief, then that Defendant is liable under this claim.

84.    Defendant Optiver made and benefited from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the other Defendants, and each of them.

85.    Defendant Optiver Holding supervised the making of and benefited from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the other Defendants, and each of them.

86.    Defendant Optiver VOF, by and through its partners Optiver Holding, Dowson, Meijer and van Kempen, benefited from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the other Defendants, and each of them.

87.    Defendant Dowson participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative trades. Dowson also benefited from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the other Defendants, and each of them.

88.    Defendant van Kempen participated in the development of the manipulative scheme and monitored the manipulative trades.  Van Kempen also benefited from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the other Defendants, and each of them.

89.     Defendant Meijer participated in the development of and approved the manipulative scheme and directed the manipulative trades.  Dowson also benefited from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the other Defendants, and each of them.

### AS AND FOR A THIRD CLAIM FOR
### UNJUST ENRICHMENT AND RESTITUTION

90.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

91.     Commodity futures contract trading is a zero sum game.  To the extent that Defendants benefited from their extensive unlawful acts, they necessarily did so by forcing Plaintiff and members of the Class to lose.

92.     All traders enter the same standardized contract subject to the same rule-set.  This prominently includes rules and laws prohibiting manipulation.

93.     It would be inequitable for Defendants to be permitted to violate that rule set and still retain the benefit which Defendants obtained from such violation and at the expense of Plaintiff and members of the Class.

94.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

95.     Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)    That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(B)    That judgment be entered against Defendants in favor of Plaintiff and the Class;

(C)    That Plaintiff and Class members recover damages, restitution, and/or Defendants' unjust enrichment;

(D)    That a constructive trust be temporarily, preliminarily, permanently or otherwise impressed on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(E)    That Plaintiff and the Class recover their costs of the suit, including attorneys' fees; and

(F)    That prejudgment interest and such further relief as the Court may deem just and proper, by awarded to Plaintiff and members of the Class.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: New York, New York
      July 30, 2008

LOVELL STEWART HALEBIAN LLP

By: _____
Christopher Lovell (CL 2595)
Gary S. Jacobson (GJ 2481)
Christopher McGrath (CM 4983)
500 Fifth Avenue, 58th Floor
New York, New York 10110
Telephone: (212) 608-1900

*Attorneys for Plaintiff and the Proposed Class*
