UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

IN RE OPTIVER COMMODITIES LITIGATION

This Document Relates To: All Actions

Master File No.
08-cv-6842 (LAP)
ECF Case

Chief Judge Loretta A. Preska

_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR**
**<u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS ................................................................................... 4

    A.  Summary of the Allegations ..................................................................... 4

    B.  The Procedural History of the Action ....................................................... 6

    C.  Defendants' Positions During the Settlement Agreement Negotiations ..................... 6

    D.  Plaintiffs' Position at the Time of the Settlement Agreement ..................... 7

    E.  The Settlement Agreement ......................................................................... 8

        1.  The Benefits to the Class: $16,750,000 Cash Payment Plus No Reversion to Defendants for those Settlement Class Members Who Fail to Claim .......... 8

        2.  The Settlement Class ....................................................................... 9

        3.  Right to Opt-Out ............................................................................. 9

        4.  The Release and Covenant Not To Sue .......................................... 9

        5.  Notice .............................................................................................. 9

        6.  The Proposed Plan of Allocation ................................................... 11

        7.  Termination Rights ......................................................................... 12

        8.  No Reversion Rights ....................................................................... 12

III. ARGUMENT ....................................................................................................... 12

    A.  Preliminary Approval Should Be Granted Because The Proposed Settlement Agreement Falls Well Within "The Reasonable Range of Approval" ..................... 12

        1.  The Legal Standards Governing Preliminary Approval ................. 12

        2.  The Settlement Agreement is Procedurally Fair and is Entitled to a Presumption of Fairness ............................................................... 13

        3.  The Proposed Settlement Agreement is Substantively Fair .......... 14

            a.  The Absence of Precedent In CEA Manipulation Cases ..................... 15

## TABLE OF CONTENTS
### (Continued)

Page

b. Factor 1: The Complexity, Expense And Likely Duration Of The Litigation ................................................. 16

c. Factor 2: The Reaction of the Settlement Class to the Settlement Agreement ................................................. 17

d. Factor 3: The Stage of the Proceedings and the Amount of Discovery Completed ................................................. 17

e. Factors 4, 5 and 6: The Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial ................... 18

f. Factor 7: The Ability of the Defendants to Withstand a Greater Judgment ................................................. 18

g. Factors 8 and 9: The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation ................................................. 18

B. The Notice Plan Should be Approved Because it Provides "The Best Notice Practicable Under the Circumstances" ................................................. 24

1. The Legal Standards Governing Notice ................................................. 24

2. The Proposed Notice Includes All the Requirements of Rule 23(c)(2)(B) and Comports With Due Process ................................................. 25

3. The Proposed Notice Plan is the Best Practicable Under the Circumstances ................................................. 26

C. The Settlement Class Should be Certified for Settlement Purposes Because it Satisfies the Four Requirements of Rule 23(a) and the Two Prongs of Rule 23(b)(3) ................................................. 28

1. The Settlement Class Satisfies the Four Requirements of Rule 23(a) ................................................. 28

a. Rule 23(a)(1)—The Members of the Settlement Class are so Numerous that Joinder of All Members is Impracticable ................................................. 28

b. Rule 23(a)(2)—There Are Numerous Questions of Law and Fact Common To The Settlement Class ................................................. 29

c. Rule 23(a)(3) —The Claims and Defenses of the Settlement Class Representatives are Typical of the Claims and Defenses of the Settlement Class ................................................. 30

**TABLE OF CONTENTS**
**(Continued)**

Page

d.   Rule 23(a)(4) —The Settlement Class Representatives Will Fairly and Adequately Protect the Interests of the Settlement Class ............... 30

2.   The Settlement Class Satisfies The Two Prongs of Rule 23(b)(3) ................. 31

a.   Common Questions of Law and Fact Predominate ............................... 31

b.   A Class Action is the Superior Method To Adjudicate These Claims ...................................................................................... 31

D.   The Court Should Appoint Lovell Stewart, Lowey Dannenberg, and Robins Kaplan to Act as Class Counsel for the Settlement Class ......................................... 32

CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anixter v. Home-Stake Prod Co.,*
    77 F.3d 1215 (10th Cir. 1996).................................................................. 22

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
    222 F.3d 52 (2d Cir. 2000)....................................................................... 30

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)................................................................................... 8

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..................................................................... 14

*Consolidated Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)....................................................................... 29

*Copperweld Corp. v. Independence Tube Corporation*,
    467 U.S. 752 (1984)................................................................................. 23

*DiPlacido v. CFTC,*
    364 F. App'x. 657 (2d Cir. 2009)............................................................ 23

*Hershey, et al., v. Pacific Investment Management Company LLC, et al.*,
    05-cv-04681 (RAG) (N.D. Ill. Jan. 26, 2011).......................................... 26

*In re Am. Bank Note Holographics, Inc., Sec. Litig.,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ..................................................... 24

*In re Amaranth Natural Gas Commodities Litig.*,
    269 F.R.D. 366 (S.D.N.Y. 2010) ...................................................... 15, 26

*In re Apple Computer Sec. Litig.,*
    No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991)........................ 22

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41(S.D.N.Y. 2012).......................................................... 24

*In re Currency Conversion Fee Antitrust Litig.*,
    01 MDL 1409, 2006 U.S. Dist. LEXIS 81440 (S.D.N.Y. Nov. 8, 2006) .................... 2, 13, 18

*In re Global Crossing Sec. and ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................ 14, 17, 18, 28

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*In re Initial Public Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) ........................................................... 28, 29, 30, 31

*In re JDS Uniphase Corp. Sec. Litig.*
No. C-02-1486 CW(EDL), 2007 WL 4788556  (N.D. Cal. Nov. 27, 2007) ................................. 22

*In re NASDAQ Mkt. Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ..................................................................... 2, 13, 24

*In re Natural Gas Commodities Litig.*,
231 F.R.D. 171 (S.D.N.Y. 2005) .................................................................... 15, 30

*In re Paine Webber Ltd. P'ships Litig.*,
147 F.3d 132 (2d Cir. 1998)........................................................................ 1

*In re Paine Webber Ltd. Partnerships. Litig.*,
171 F.R.D. 104 (S.D.N.Y.1997) .................................................................... 14

*In re Platinum and Palladium Commodities Litig.*,
10 Civ. 3617 (WHP) (S.D.N.Y. July 15, 2014) ................................................. 26

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ................................................................... 17

*In re Sumitomo Copper Litig.*,
194 F.R.D. 480 (S.D.N.Y. 2000) ................................................................... 15

*In re Sumitomo Copper Litig.*,
74 F. Supp. 2d 393 (S.D.N.Y. 1999)................................................................ 16

*In re Warner Chilcott Ltd. Secs. Litig.*,
06-cv-11515 (WHP), 2008 U.S. Dist. LEXIS 99840 (S.D.N.Y. Nov. 20, 2008) .................... 1

*In the Matter of Anthony J. DiPlacido*,
CFTC No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008)....................................23

*Jaffe v. Household, et al.*,
02-cv-05893 (RAG) (N.D. Ill. May 7, 2009)......................................................... 11

*Maley v. Del Global Technologies*,
186 F. Supp. 2d 385 (S.D.N.Y. 2002)................................................................ 14

*Maywalt v. Parker & Parsley Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995)........................................................................ 14

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Robbins v. Koger Props., Inc.,*
   116 F.3d 1441 (11th Cir. 1997) ................................................. 22

*Simplot v. Strobl,*
   474 U.S. 1006 (1985) ............................................................. 15

*Strobl v. New York Mercantile Exch.,*
   582 F. Supp. 770 (S.D.N.Y. 1984) ............................................. 15

*Strougo v. Bassini,*
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ........................................ 16

*Wal–Mart Stores, Inc. v. VISA U.S.A. Inc.,*
   396 F.3d 96 (2d Cir. 2005) ...................................... 1, 13, 16, 25

## Other Authorities

James D. Cox & Randall S. Thomas,
   *Letting Billions Slip Through Your Fingers:  Empirical Evidence and Legal
   Implications of the Failure of Financial Institutions to Participate in Securities Class
   Action Settlements,*
   58 Stan. L. Rev. 411 (2005) ..................................................... 20

Jerry W. Markham,
   Manipulation of Commodity Futures Prices – The Unprosecutable Crime,
   8 Yale J. on Reg. 281 (1991) ................................................... 16

John C. Coffee, Jr.,
   *Litigation Governance:  Taking Accountability Seriously,*
   110 Colum. L. Rev. 288 (Mar. 2010) .......................................... 20

Newberg on Class Actions, §11.41 (4th ed.) ..................................... 1

## Rules

Fed. R. Civ. P. 23……………………………………………………………….…… *passim.*

## I.    INTRODUCTION

Plaintiffs[1], on behalf of themselves and the Settlement Class (defined below), respectfully submit this memorandum in support of their motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for preliminary approval of the Stipulation and Agreement of Settlement ("Settlement Agreement").[2]

The Settlement Agreement was executed by the Plaintiffs and the Defendants[3] on July 24, 2014, and will provide guaranteed cash settlement funds of $16,750,000.  If approved, the Settlement Agreement will resolve all claims in this Action that Defendants manipulated prices and caused losses in the trading of New York Mercantile Exchange ("NYMEX") Light Sweet Crude Oil New York Harbor Heating Oil, and New York Harbor Gasoline futures contracts during the Class Period).  ECF No. 49 at ¶¶ 1-2.

The settlement of a class action requires court approval.  Compare Fed. R. Civ. P. 23(e) (settlements in class actions require "…the court's approval") with *In re Warner Chilcott Ltd. Secs. Litig.*, 06-cv-11515 (WHP), 2008 U.S. Dist. LEXIS 99840, at *2-3 (S.D.N.Y. Nov. 20, 2008) ("[t]he settlement of complex class action litigation is favored by the Courts"), citing *Wal–Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *In re Paine Webber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998); *see also Newberg on Class Actions*, §11.41, at 87 (4th ed.) ("[t]he compromise of complex litigation is encouraged by courts and favored by public policy").

---

[1] "Plaintiffs" refer to Plaintiffs Michael Amdur, Brendan Cody, Charles Hynes and Richard White.

[2] A copy of the Settlement Agreement and its exhibits are attached to the Declaration of Bernard Persky, Esq. ("Persky Decl.") as Exhibit 1.  Capitalized terms herein that are defined in the Settlement Agreement have the same meaning as in the Settlement Agreement.

[3] "Defendants" refers to Optiver US LLC, Optiver Holding B.V., Optiver VOF, Christopher Dowson, Bastiaan van Kempen, and Randal Meijer.

After a proposed class action settlement is reached, a court must determine whether the proposed settlement warrants preliminary approval. *In re Currency Conversion Fee Antitrust Litig.*, 01 MDL 1409, 2006 U.S. Dist. LEXIS 81440, at *13 (S.D.N.Y. Nov. 8, 2006) (Pauley, J.) ("*Currency Conversion*"). This Court has previously held that:

> where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval, preliminary approval is granted.

*Id.*, *citing In re NASDAQ Mkt. Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("NASDAQ").

After preliminary approval has been granted, notice is then sent to members of the class, including notice of a "fairness hearing" where class members and the parties to the settlement may be heard before the court grants final approval of the settlement. *Currency Conversion*, 2006 U.S. Dist. LEXIS 81440, at *13. After such fairness hearing, the district court finally determines whether the proposed class action settlement is both procedurally and substantively fair, reasonable and adequate. *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009).

The Plaintiffs, on behalf of themselves and the proposed Settlement Class, now respectfully move the Court to grant preliminary approval of the Settlement Agreement and enter the [Proposed] Order Preliminarily Approving Proposed Settlement, Scheduling Hearing For Final Approval Thereof, and Approving the Proposed Form and Program of Notice To The Class ("Preliminary Approval Order") attached as Exhibit 1-1 to the Persky Decl. that, among other things:

1. finds the Settlement Agreement to be sufficiently fair, reasonable, and adequate to warrant dissemination of notice of the Settlement Agreement to the Settlement Class (Persky Decl. Ex. 1-1 ¶ 10);

2. certifies the proposed Settlement Class for settlement purposes (*id.* ¶ 3);

3. appoints the firms Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart"), Lowey Dannenberg Cohen & Hart, P.C. ("Lowey Dannenberg"), and Robins, Kaplan, Miller & Ciresi L.L.P. ("Robins Kaplan") as Class Counsel for the Settlement Class (*id.* ¶ 4);

4. appoints Plaintiffs Michael Amdur, Brendan Cody, Charles Hynes and Richard White as representatives of the Settlement Class (*id.* ¶ 5);

5. finds the notice plan to be the best practicable notice under the circumstances (*id.* ¶ 18);

6. approves the forms of and substance of the notice of the Settlement Agreement to the Settlement Class (*id.*);

7. approves A.B. Data, Ltd. as the Settlement Administrator and Escrow Agent (*id.* ¶ 33); and;

8. sets a schedule leading to the Court's consideration of final approval of the Settlement Agreement, including:

   a. the date, time, and place for a hearing to consider the fairness, reasonableness and adequacy of the Settlement Agreement ("Fairness Hearing") (*id.* ¶ 7);

   b. the deadline for members of the Settlement Class to exclude themselves (*i.e.*, opt out) from the Settlement Agreement (*id.* ¶ 25);

   c. the deadline for Class Counsel to submit a petition for attorneys' fees and reimbursement of expenses, and incentive awards for Settlement Class representatives (*id.* ¶ 37); and

    d.  the deadline for members of the Settlement Class to object to the Settlement

        Agreement and any of the related petitions (*id*. ¶ 20).

At the Fairness Hearing, Plaintiffs will request the entry of a final order and judgment substantially in the form of Persky Decl. Ex. 1-7.  The proposed final judgment would dismiss the Action as to the Defendants and retain jurisdiction for the implementation and enforcement of the Settlement Agreement.

## II.  STATEMENT OF FACTS

### A.  Summary of the Allegations

Plaintiffs allege that each Defendant, between March 2, 2007 and March 26, 2007, inclusive (the "Class Period"), caused and aided and abetted the causation of artificial prices in NYMEX Light Sweet Crude Oil, NYMEX New York Harbor Heating Oil, and NYMEX New York Harbor Gasoline futures contracts, to the extent such contracts were traded or held at any time between March 2, 2007 through March 26, 2007, inclusive (the "Class Contracts"). Plaintiffs allege that Defendants violated the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, et seq., the Sherman Antitrust  Act ("Sherman Act"), 15 U.S.C. §§  1 and 2, NYMEX rules, and the common law by amassing dominant NYMEX trading at settlement ("TAS") contract positions and offsetting such positions through NYMEX futures contracts transactions in the opposite direction of the TAS positions during the Closing Period (as that term is defined in the Complaint).  *See*, *e.g.*, ECF No. 49 at ¶¶ 12, 17, 100.

Defendants allegedly overpaid to buy and undersold to sell the contracts during the Closing Period and thereby caused the Volume Weighted Average Prices ("VWAP") of those contracts to be artificial.  During the relevant period, NYMEX rules provided that the settlement price of the current delivery of the spot month futures contract was the VWAP of all outright transactions which occur in that delivery month during the Closing Period.

Plaintiffs allege that the large trading by Defendants during the Closing Period consistently caused a statistically significant, persistent and non-transitory impact on prices for NYMEX Crude Oil, Heating Oil and Gasoline futures contracts.  Plaintiffs allege that Defendants' conduct caused Plaintiffs and others similarly situated to transact in an artificial and manipulated market at manipulated and artificial prices during the Class Period.  ECF No. 49 at ¶¶ 24-26.   Plaintiffs further allege that Plaintiffs and Settlement Class Members who held positions in Class Contracts at the times that Defendants allegedly manipulated the prices of those contracts and thereafter liquidated their positions in such contracts at artificial prices suffered damages even if such liquidations occurred after the Class Period. *Id*. at ¶ 27.   Plaintiffs also allege that Defendants'  manipulation constituted a contract, combination or conspiracy in restraint of trade and an attempt to monopolize and monopolization of the market for the Class Contracts.  *Id*. at ¶¶ 91, 229-236.  Finally, Plaintiffs allege that Defendants attempted to and did manipulate the markets for NYMEX Light Sweet Crude Oil, NYMEX New York Harbor Heating Oil, and NYMEX New York Harbor Gasoline futures contracts.  *Id*. at  ¶¶ 3-8, 193-194, 237-243.

The claims alleged in the Complaint arise out of the same set of facts as those alleged in a related action brought against Defendants by the Commodity Futures Trading Commission ("CFTC") captioned *U.S. Commodity Futures Trading Commission v. Optiver US, LLC, Optiver Holding B.V., Optiver VOF, Christopher Dowson, Bastiaan van Kempen, and Randal Meijer*, 08-CV-6560 (LAP) (S.D.N.Y.) (the "CFTC Action").  On April 19, 2012, Defendants settled the CFTC Action.  In connection with the settlement of the CFTC Action, the Court entered a Final Consent Order And Permanent Injunction, Civil Monetary Penalty And Other Relief, pursuant to which the CFTC obtained $14 million in civil penalties and disgorgement from Defendants.  *Id*. Defendants did not admit or deny the allegations against them in that action.  *Id.*

**B.      The Procedural History of the Action**

The procedural history of the Action is set forth at length in the attached Persky Decl.

**C.      Defendants' Positions During the Settlement Agreement Negotiations**

A critical issue in this case is whether Defendants' trading strategy was, in fact, manipulative.  Defendants argued, and some contemporaneous evidence provided in the confirmatory discovery tended to support, that their trading strategy did ***not*** inject artificial forces of supply or demand into the market, and that Defendants allegedly did not intend to inject such forces into the market.  While Plaintiffs dispute that evidence (*see* Section D below), at a minimum it could be argued to have created a triable issue of fact, the outcome of which could not be predicted with any certainty.

In addition, in their June 12, 2013 letter to Plaintiffs describing the alleged deficiencies in Plaintiffs' Complaint, provided pursuant to the Court's order dated March 14, 2013, Defendants raised a number of legal arguments in favor of dismissal of the Complaint.  Among other things, Defendants argued that Plaintiffs failed to allege facts that plausibly suggest that Defendants intended to manipulate the prices of Class Contracts, a required element of a manipulation claim under the CEA.  To the contrary, Defendants contended that their large quantity of futures trading during the Closing Period could be explained by their desire to hedge their TAS positions, a legitimate activity.  In addition to this argument, Defendants also attacked the scope of Plaintiffs' alleged damages as well as the plausibility of Plaintiffs' Sherman Act, unjust enrichment and secondary CEA claims.

At the time the settlement in principle was reached, Plaintiffs were preparing to amend their complaint with the strong likelihood that Defendants would ultimately file a motion to dismiss.  Assuming Plaintiffs survived the Defendants' motion to dismiss their complaint, they would have faced further risks. These further risks include class certification and interlocutory

appeal thereof, summary judgment, *Daubert* and other *in limine* motions.  Even then, the

Plaintiffs would face the risk of a trial and, to the extent successful at trial, on post-trial motions

and then appeal.

### D.   Plaintiffs' Position at the Time of the Settlement Agreement

Prior to entering the Settlement Agreement, Class Counsel reviewed and analyzed all of

the documents Defendants had produced to the CFTC and the Defendants' relevant transactions

recorded in the NYMEX Street Book.  Based on such extensive discovery and intensive factual

investigation, analyses and research, as well as significant experience with CEA manipulation

claims, and more than five years of arguments/negotiations with Defendants' counsel about the

application of CEA manipulation, antitrust and common law to the facts here, Class Counsel

were well informed of the prospective risks, rewards, arguments, rejoinders, and other issues that

would be involved with continued prosecution of the claims here.

Class Counsel's position just prior to entering into the Settlement Agreement was that the

evidence indicated that Defendants intentionally overpaid to buy and undersold to sell NYMEX

Light Sweet Crude Oil, NYMEX New York Harbor Heating Oil, and NYMEX New York

Harbor Gasoline futures contracts during the Closing Period and thereby caused the VWAP of

the Class Contracts to be artificial.

As to the critical issue of whether Defendants' trading strategy was manipulative, Plaintiffs

argued, and certain email and other evidence indicated, that Defendants calculated the transfer of

the supply or demand in a particular market in a way to have a greater impact on prices in the

futures market than legitimate trading would have had.

Class Counsel believed that the proof of such unlawful manipulation could support and

prove damages under the CEA as well as the antitrust laws, which would be trebled if Plaintiffs

were successful in prosecuting their antitrust claims.  However, Class Counsel could not

disregard or ignore Defendants' substantial legal and factual arguments.  This included the risk that many of the allegedly manipulative trades would not be considered to be manipulative because Defendants ostensibly intended their heavy trading during the Closing Period to serve as a hedge to their TAS positions or their trading activity was nothing more than that of a market-maker.

In the foregoing context, Class Counsel's analysis was, and is, that the all-cash payment of $16.75 million under the Settlement Agreement will provide fair, reasonable and adequate compensation to claiming Settlement Class Members. *See* III.A.3.g *infra* (elaborating on the settlement recovery compared to other metrics and the likely payout to claiming Settlement Class Members based on prior experience with the number of settlement class members who fail to file a claim).

### E.  The Settlement Agreement

The Settlement Agreement and its exhibits include the following material terms.

### 1.  The Benefits to the Class: $16,750,000 Cash Payment Plus No Reversion to Defendants for those Settlement Class Members Who Fail to Claim

The Settlement Agreement provides for two benefits to Settlement Class members.  First, total cash compensation in the amount of $16,750,000 is to be provided by Defendant Optiver US LLC on behalf of Defendants within seven days after entry of the Preliminary Approval Order.  Persky Decl. Ex. 1 ¶ 3. Second, the shares of these monies due to Settlement Class Members who fail to submit a claim will not revert to Defendants and will, instead, be added and included in the calculation of the payment to the Settlement Class Members who do submit claims.  However, if the claims went forward and if Plaintiffs did prevail at trial, then Defendants could argue that the claims of those class members who did not claim should revert to Defendants.  *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 488 (1980).

### 2.     The Settlement Class

For purposes of the Settlement Agreement, the Parties have proposed certification of the

Settlement Class defined as follows:

> All Persons that purchased, sold or held NYMEX Light Sweet
> Crude Oil futures contracts, NYMEX New York Harbor Heating
> Oil futures contracts or NYMEX New York Harbor Gasoline
> futures contracts at any time from March 2, 2007 through March
> 26, 2007. Excluded from the Settlement Class are (i) members of
> the judiciary assigned to this case, including their immediate
> family members; (ii) Class Counsel and their employees; (iii)
> Defendants and any parent, subsidiary, affiliate, employee or agent
> of any Defendant, including Defendants' counsel; and (iv) Opt
> Outs.

Persky Decl. Ex. 1 *Id.* ¶ 1(kk).

### 3.     Right to Opt-Out

Given the timing of the Settlement Agreement, if, notwithstanding the foregoing, any

Settlement Class members do not have the same judgment about the fair compensation here as

does Class Counsel, then those Settlement Class members have the right to opt out of the

Settlement Agreement. *Id.* ¶ 10.

### 4.     The Release and Covenant Not To Sue

In exchange for the foregoing consideration, Plaintiffs and the Settlement Class have

agreed to release and discharge Defendants from any and all claims against Defendants for losses

on their transactions in Class Contracts during the Class Period as fully set forth in Paragraph 8

of the Settlement Agreement. *Id.* ¶ 8.

### 5.     Notice

The proposed notice plan is comprehensive and calculated to reach – by direct mail alone –

potentially all persons who are members of the Settlement Class. In addition, notice will

provided by advertisements in The Wall Street Journal, Futures Magazine, and Technical

Analysis of Stocks and Commodities Magazine.  *See* III.B. *infra*.  Notice will also be provided by a settlement website that is searchable on the internet.[4]  *Id*. ¶ 7.

**Direct Mail Notice**. The proposed notice plan includes mailing notice of the Settlement, substantially in the form of Exhibit 2 to the Settlement Agreement by United States first class mail, postage prepaid, to (a) all large traders in Class Contracts whose names have been obtained by Plaintiffs pursuant to a subpoena to the NYMEX; (b) all clearing brokers on the NYMEX whose names have been obtained by Plaintiffs pursuant to a subpoena to the NYMEX, with the direction that such clearing brokers should forward the Mailed Notice to all of their customers who bought, sold or held Class Contracts or should provide the names and addresses of such customers to the Settlement Administrator; and (c) any additional reasonably identifiable potential Settlement Class Members.  *Id*. ¶ 7(b).

**Publication Notice**. The proposed notice program also includes publishing notice of the Settlement, substantially in the form of Exhibit 3 to the Settlement Agreement, as follows: (a) for two consecutive months in Futures Magazine; (b) on the Futures Magazine website for one month; (c) for two consecutive months in Technical Analysis of Stocks and Commodities Magazine; (d) on the Technical Analysis of Stock and Commodities Magazine website for one month; and (e) in two editions of The Wall Street Journal as a quarter page notice.  *Id*.  ¶ 7(c). Finally, notice of the Settlement Agreement will also be published on a website created by the Settlement Administrator. *Id*. ¶ 7(d).  The settlement website will be searchable on the internet. *Id*.

---

[4] Everyone who transacted in Class Contracts had to do so through a NYMEX clearing broker. The Class Notice instructs the NYMEX clearing brokers either to forward the Class Notice to their customers who bought, sold or held Class Contracts during the Class Period, or to provide the Settlement Administrator with such customers' names and addresses.

### 6.   The Proposed Plan of Allocation

In this Action, Plaintiffs were prepared to prove damages based on their expert's economic calculations of artificial impact that Defendants' activities allegedly had on the prices of Class Contracts for each trading day during the Class Period.  *See* Jury Verdict at 70-95, *Jaffe v. Household, et al.*, 02-cv-05893 (RAG) (N.D. Ill. May 7, 2009), ECF No. 1611 (jury's answers to interrogatories specifying amounts of artificiality for each of the 780 trading days during the class period). Thus, as in *Household* and in previous CEA manipulation class settlements, the proposed Plan of Allocation here (Persky Decl. Ex. 1-6) also has tables of daily amounts of artificiality for each trading day between March 2, 2007 and March 26, 2007, inclusive, for NYMEX Light Sweet Crude Oil, NYMEX New York Harbor Heating Oil, and NYMEX New York Harbor Gasoline futures contracts.

These figures are Plaintiffs' expert's artificiality numbers (which Defendants disputed as much too high).  As described below, the Plan of Allocation effectively determines each Settlement Class Member's claim as the amount by which the Settlement Class Member was harmed or adversely affected by the alleged manipulation minus the benefits, if any, such Settlement Class Member received from the alleged manipulation.

Specifically, the Plan of Allocation provides that each Settlement Class Member's Allowed Claim (as defined in ¶ 2 of the Plan of Allocation) shall be based on the Adverse Impact such Settlement Class Member suffered less any applicable Hedging Reduction and/or the Swaps Dealer Reduction (as defined in ¶ 6 of the Plan of Allocation).  Persky Decl. Ex. 1-6 ¶ 2.  The Adverse Impact suffered by each claiming Settlement Class Member is defined to mean the amount by which the sum of the Artificiality Paid (as defined in ¶ 4(a) of the Plan of Allocation) by a Settlement Class Member on all transactions in Class Contracts exceeds the sum of the

11

Artificiality Received (as defined in ¶ 4 of the Plan of Allocation) by that Settlement Class Member on all transactions in Class Contracts. *Id.* ¶ 3.

The Net Settlement Fund (as defined in ¶ 1(u) of the Settlement Agreement) shall be distributed as follows:  Each Settlement Class Member who executes the required release and covenant not to sue and submits adequate documentation, all as determined by the Settlement Administrator, shall be entitled to receive an amount computed by multiplying the Net Settlement Fund by a fraction, (i) the numerator of which is the Settlement Class Member's Allowed Claim and (ii) the denominator of which is the sum of the Allowed Claims of all claiming Settlement Class Members who executed the required release and covenant not to sue, all as determined by the Settlement Administrator.  Proposed Plan of Allocation, Persky Decl. Ex. 1-6 ¶ 7.

**7.     Termination Rights**

The Settlement Agreement gives the parties limited rights to terminate the settlement prior to entry of final judgment.  Persky Decl. Ex. 1 ¶ 17.  In addition, the Settlement Agreement also refers to a confidential supplemental agreement describing terms and conditions pursuant to which Defendants may elect to terminate the Settlement Agreement.  That confidential supplemental agreement will be filed with the Court under seal.  *Id.* ¶ 17(a).

**8.     No Reversion Rights**

There will be no reversion rights to Defendants under the Settlement Agreement.

**III.   ARGUMENT**

**A.     Preliminary Approval Should Be Granted Because The Proposed Settlement Agreement Falls Well Within "The Reasonable Range of Approval"**

**1.     The Legal Standards Governing Preliminary Approval**

This Court has previously held that:

> where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval, preliminary approval is granted.

*Currency Conversion*, 2006 U.S. Dist. LEXIS 81440, at *13 citing *NASDAQ*, 176 F.R.D. at 102. Here, the Settlement Agreement has no "obvious deficiencies." *Id.*   Plaintiffs address non-collusive negotiations and the reasonableness of the consideration in detail in III.A.2 and 3 below.

### 2.   The Settlement Agreement is Procedurally Fair and is Entitled to a Presumption of Fairness

A class action settlement is entitled to a presumption of fairness, adequacy and reasonableness when "there were arm's length negotiations between experienced counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005) ("*Wal-Mart*").

The prolonged, multi-year negotiations that produced the Settlement Agreement here were strictly at arm's length and free of collusion. Persky Decl. ¶ 4.  The Parties to the Settlement Agreement have been represented by experienced counsel. *Id.*  ¶ 5.  The proposed Settlement Agreement is the product of hard-fought negotiations over a period of more than five years, which involved scores of meetings and/or telephone conferences, hundreds of e-mails, and an extensive review of the confirmatory discovery and information provided by NYMEX pursuant to subpoena.

In light of their considerable prior experience in complex class action litigation involving CEA and antitrust claims, their knowledge of the strengths and weaknesses of Plaintiffs' claims and their assessment of the Settlement Class's likely recovery following trial and appeal,  Class Counsel concluded that the Settlement Agreement is fair, reasonable and adequate.  *Maley v. Del*

*Global Technologies*, 186 F.Supp.2d 385, 366 (S.D.N.Y. 2002) (citing *In re Paine Webber Ltd.*

*Partnerships. Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y.1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997))

("great weight" is accorded to the recommendations of counsel, who are most closely acquainted

with the facts of the underlying litigation).

### 3. The Proposed Settlement Agreement is Substantively Fair

In order to determine whether a proposed class action settlement is substantively fair,

reasonable and adequate *for purposes of final approval*, courts in this Circuit may consider:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; and (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

*Compare City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) with *Maywalt v.*

*Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079-80 (2d Cir. 1995) ("*Maywalt*"). "[N]ot

every factor must weigh in favor of settlement, rather the court should consider the totality of

these factors in light of the particular circumstances." *In re Global Crossing Sec. and ERISA*

*Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  As

set forth below, the *Grinnell* factors strongly support preliminary approval of the Settlement

Agreement.

Fundamental to a determination of whether a settlement is fair, reasonable and adequate

"'is the need to compare the terms of the compromise with the likely rewards of litigation.'"

*Maywalt*, 67 F.3d at 1079-80.  In making the determination, the Settlement Agreement must be

considered as a whole.  *Id*. at 1079.

14

a.      **The Absence of Precedent In CEA Manipulation Cases**

Unlike with federal securities law class actions, in which more than one hundred cases per year are often filed, CEA commodity futures manipulation class actions are relatively rare, averaging approximately one commodity manipulation class action filed every two years.[5]  Thus, in the more than thirty years since the private right of action under Section 22 of the CEA was established, the U.S. Supreme Court and the Second Circuit Court of Appeals have not rendered decisions on numerous aspects of the pleading standards.

The Second Circuit has repeatedly refused to set aside decisions certifying classes of traders asserting manipulation of commodity futures prices.[6]  And the Second Circuit has upheld a pre-Section 22(a) civil damages CEA manipulation verdict.  *Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985), *cert. denied sub nom.*, *Simplot v. Strobl*, 474 U.S. 1006 (1985).  More recently, the Second Circuit upheld an administrative finding of manipulation. *In the Matter of Anthony J. DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *10 (CFTC Nov. 5, 2008), *aff'd sub nom.*, *DiPlacido v. CFTC*, 364 F. App'x. 657 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 1883 (2010).  But, so far, there is an absence of controlling precedent on claims under Section 22(a).

Also, in this court, there have been differing decisions involving the applicable pleading standards under the CEA.  Thus, CEA manipulation law—wholly unlike federal securities law or

---

[5] A LEXIS search for commodity manipulation class actions yielded only forty-six entries, going back to 1974. (The search of the ALLFEDS database specified the following terms: "class /3 action /p commodity! /s manip!".) When duplicate entries and non-commodity cases were culled from the list, only twenty cases remained, averaging one commodity manipulation class action filed every two years.

[6] *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010), *petition for review denied*, No. 10-4110-mv (2d Cir. Dec. 28, 2010); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 186 (S.D.N.Y. 2005), *petition for review denied,* No. 05-5732-cv (2d Cir. Aug. 30, 2006*); In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000), *appeal denied*, 262 F.3d 134 (2d Cir. 2001).

federal antitrust law—is somewhat of an "open field" for Defendants to argue for what Plaintiffs view as restrictive application of the limited precedent.  There is potentially a wide divergence of outcomes that could result from continued litigation in many fact scenarios (including those here).

In the foregoing context, the uncertainty, risk, expense and prospective time involved in this CEA manipulation case is much greater than in other types of cases.  Thus, in CEA manipulation cases, settlement may become a "saga" in itself.  *In re Sumitomo Copper Litig.*, 74 Supp.2d 393, 396 (S.D.N.Y. 1999) (Pollack, J.).

        **b.**    <u>**Factor 1**</u>**: The Complexity, Expense And Likely Duration Of The Litigation**

There is a consensus that claims for manipulation in violation of the CEA are complex and difficult to prove.  *Compare* Jerry W. Markham, Manipulation of Commodity Futures Prices – The Unprosecutable Crime, 8 Yale J. on Reg. 281 (1991) *with In re Sumitomo*, 74 F. Supp. 2d at 397 (same). Also, "antitrust cases, by their nature, are highly complex." *Wal-Mart*, 396 F.3d at 122.

Added to the complexity of the claims asserted in this case is the absence of controlling precedent for the CEA manipulation claims. *See* § III(A)(3)(a) *supra*.

In the absence of this Settlement Agreement, the litigation of this complex case would likely have consumed many more years of judicial resources.  *Strougo v. Bassini*, 258 F.Supp.2d 254, 261 (S.D.N.Y. 2003) ("[t]he potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class").  The Settlement Agreement allows the Parties and the Court system to avoid the significant expense of continued and protracted litigation.  The costs of experts, the costs of preparing the voluminous pre-trial order, the costs of summary judgment motion practice as well as trial and appeals would

have been substantial.  Further, appeals of any summary judgment decision or final judgment (which, given the size and nature of the Plaintiffs' claims were almost guaranteed) all but assured that this litigation would have dragged on without final resolution or relief for many years in the absence of settlement.

The Settlement Agreement eliminates the foregoing complexities, substantial expenses, the potential for additional years of continued litigation and provides a prompt recovery to the Settlement Class.  *See  In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) ("it may be preferable to take the bird in the hand instead of the prospective flock in the bush").

### c.     Factor 2: The Reaction of the Settlement Class to the Settlement Agreement

At this time, Plaintiffs are not aware of any objections to the Settlement Agreement.  One benefit of this Settlement Agreement at this juncture is that any Settlement Class Member who has a different judgment than Class Counsel about the Settlement Agreement may opt out.  After the Settlement Class has been provided notice of the Settlement Agreement, Plaintiffs will address the Settlement Class's reaction in their motion seeking final approval.

### d.     Factor 3: The Stage of the Proceedings and the Amount of Discovery Completed

This factor is designed to "assure the Court that counsel for the plaintiffs have weighed their position based on a full consideration of the possibilities facing them."  *In re Global Crossing Securities* 225 F.R.D. at 458.  Extensive confirmatory discovery and investigation had been completed before the Settlement Agreement was concluded. Persky Decl. ¶ 6.  Thus, at the time the Settlement Agreement was reached, Class Counsel were well-informed of the factual landscape of the Action and the uncertainties and risks confronting them.  *Id.*

     **e.**    <u>Factors 4, 5 and 6</u>: **The Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial**

As this Court has recognized, "the complexity of Plaintiffs' claims *ipso facto* creates uncertainty." *Currency Conversion*, 263 F.R.D. at 123.  Continuing this complex litigation against the Defendants would entail a lengthy and highly expensive legal battle involving complex legal and factual issues.  Establishing damages herein would have required significant expert testimony.  Defendants had significant factual and legal defenses which created real risk that Plaintiffs would not establish liability.  *See* "Defendants' Positions" *supra*.  Even if Plaintiffs did establish liability, there was a very real risk that they would not establish entitlement to damages of more than a minuscule fraction of what Plaintiffs asserted.  Plaintiffs acknowledge that, if these risks materialized, their impact would have been substantial for all parts of the claims and perhaps dispositive for most parts of the claims.

     **f.**    <u>Factor 7</u>: **The Ability of the Defendants to Withstand a Greater Judgment**

Plaintiffs believe that Defendants could withstand a judgment greater than the $16,750,000 cash consideration they have agreed to provide as part of the Settlement Agreement.  However, this fact does not indicate that the Settlement Agreement is not fair, reasonable or adequate. *Global Crossing*, 255 F.R.D., 456, 460 ("[N]ot every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances . . . [T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate").

     **g.**    <u>Factors 8 and 9</u>: **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The eighth and ninth factors under *Grinnell* are:

> (8) [T]he range of reasonableness of the settlement fund in light of the best possible **recovery**, *Id*. at 1387; (9) the range of reasonableness of the settlement

> fund to a possible recovery in light of all the attendant risks of litigation, *Id*. at 1385.

(emphasis supplied).  *Grinnel*, 495 F.2d at 463.  Regarding Factor 8, a future "**recovery**" to class

members involves at least three components: (1) collection of (2) a damages[7] judgment which (3)

is then paid to or "recovered" by individual class members.  Further, the amounts of the

judgment fund that are collected and are due to those class members who *fail* to submit proofs of

claim, will revert (other than the attorney's fees) back to defendants and will not be "recovered"

by any class member. *Id.*

In this settlement, Plaintiffs have obtained benefits relating to all three components of the

recovery. They have obtained the all-cash settlement of $16.75 million to be paid into an escrow

fund thereby satisfying the collection component and a portion of the damages component.

Plaintiffs also have obtained the waiver by Defendants of any potential post-trial reversionary

rights.  *See* "Benefits" "E.1" *supra*.  As a result, the "recovery" by Settlement Class Members

who do submit proofs of claim will be enhanced compared to a post-trial recovery.  This is

because *all* monies that would otherwise have been due to Settlement Class Members who do not

claim and would potentially have reverted to Defendants will be paid and included in the

distributions to those Settlement Class Members who *do* claim.

In prior class actions, the percentage of total class members who submit proofs of claims

has frequently been less than 50% and, indeed, reportedly is less than 30% among even

sophisticated class members (including those who arguably have fiduciary duties to submit

claims).[8]  Thus, a smaller amount in a settlement in which the defendant has provided the benefit

---

[7] Damages, as used in this section, refers to actual damages, not the trebled damages available under antitrust law.

[8] The percentage of claims submitted in opt-out class action settlements varies from below ten percent to less than thirty percent.  John C. Coffee, Jr., *Litigation Governance:  Taking*

of waiving any claim to reversion rights amounts to the same or a larger "recovery" to claiming Settlement Class Members as a larger judgment after trial would produce for such claiming class members subject to reversion.

**Best Possible Damages.**  Plaintiffs' economist currently estimates that, using his full artificiality numbers, the highest possible amount of damages the class could prove at trial is a statistical maximum of approximately $330 million and a statistical minimum of approximately $72 million, depending upon the different possible combinations of potential trading profiles within the market.  The foregoing damages estimates do not deduct the offsets in artificiality and damages that Defendants contend would have reduced the total damages due to the Settlement Class because certain Settlement Class Members benefited from artificiality in a different commodity futures contract than the ones in which the Settlement Class Member suffered artificiality.  Plaintiffs' expert has no incontrovertible way to estimate the magnitude of this possible discount.  It could, in fact, be significant.[9]  Plaintiffs' expert has estimated, through the

---

*Accountability Seriously*, 110 Colum. L. Rev. 288, 335, n. 10 (Mar. 2010) (citing discussions on claim participation rates with professional claims administrators, including the largest of these, Garden City Group, Inc., and referring to advice received that "participation rates are highly variable, often falling below ten percent, but can reach much higher percentages when individual class members will receive a cash payment of several hundred dollars or more."); James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your Fingers:  Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements*, 58 Stan. L. Rev. 411, 415 (2005) ("[L]ess than thirty percent of institutional investors with provable losses perfect their claims in [securities class action] settlements.").

[9] Any Settlement Class Member could have positions in not only NYMEX Light Sweet Crude Oil futures contracts, but also the NYMEX Heating Oil Futures Contracts or NYMEX Gasoline futures contracts that comprise the three types of commodity Class Contracts here.

In these three markets in particular, there are "spread" traders who purposely have long positions in crude oil futures contracts and short positions in heating oil and/or gasoline futures contracts.  There are also spread traders who take the opposite spread, *i.e.*, a short position in crude oil futures contracts and long positions in heating oil and or gasoline futures contracts.  These spread positions include a "3, 2, 1 crack spread" in which a trader, for example, is long 3 crude oil

statistical minimum listed above, deductions for gains in artificiality from the same ***commodity*** futures contract.  That is, Plaintiffs' expert's maximum and minimum damages take account of gains from artificiality that each trader in, for example, gasoline futures contracts experienced with respect to the artificiality that the Settlement Class Member suffered in gasoline futures contracts.  But the estimates cannot take account of offsets to artificiality suffered in gasoline futures from gains in artificiality experienced in crude oil or heating oil futures contracts.

Using the midpoint between the statistical minimum ($72 million) and statistical maximum ($330 million) produces a best-possible damages estimate of $201 million.  The $16,750,000 cash consideration of the settlement would constitute 8.3% of this midpoint of best-possible damages (without taking into account the reversion waiver benefit to the Settlement Class Members who file claims).

**Collection.**  Class Counsel believe that $72,000,000 would very likely be recovered from Defendants.  The midpoint $201,000,000 in damages would likely be collected in whole or substantial part.  However, recovering the $330,000,000 maximum damages, while clearly possible, is, in Class Counsel's judgment, much more questionable.

**Recovery.**  As stated above, each claiming Settlement Class Member's actual recovery from their proof of claim will be significantly enhanced by the absence of any reversion with respect to Settlement Class Members who opt out or Settlement Class Members who fail to

---

futures contracts, and is short 2 heating oil futures contracts and 1 gasoline futures contract (or short 2 gasoline futures contracts and 1 heating oil futures contract).

The presence of simultaneous positions held in futures contracts by Settlement Class Members is not a variable that Plaintiffs' expert could estimate with any certainty for purposes of estimating the final maximum possible damages.  All that can be said is that Defendants would argue that such traders exist, the percentage of the market that they constitute could be significant on one or more days, and the result arguably would be to reduce the best possible damages.

21

submit proofs of claim. Class Counsel expect that, in view of all the circumstances in this type of case, it is likely that the inevitable enhancement resulting from the Defendants' reversion waiver will be at least two, and likely three or more times as much as in the absence of the reversion waiver. *See* fn. 8 *supra.* Using the midpoint percentage recovery, Class Counsel's best estimate is that the benefits from this settlement to Settlement Class Members will translate into a recovery by claiming Settlement Class Members of ***at least*** twice as much as the 8.3% midpoint *i.e.,* 16.6%.

***Grinnel* Factor 9.**  Under *Grinnell* Factor 9, Class Counsel's best judgment is that there are significant risks of establishing liability and very substantial risks of proving damages on these claims. This is in addition to the risks of collecting on damages and recovery by individual Settlement Class Members and recovery of their share of damages as described, *supra.*

 **Liability.**  All litigation is risky. Even a meritorious case can be lost at trial. *See In re JDS Uniphase Corp. Sec. Litig.* No. C-02-1486 CW(EDL), 2007 WL 4788556, at *1 (N.D. Cal. Nov. 27, 2007)  (after a lengthy trial, jury returned a verdict against plaintiffs and the action was dismissed). Further, a successful jury verdict does not eliminate the risk to the class.  *See Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1449 (11th Cir. 1997)  (reversing $81 million jury verdict.); *Anixter v. Home-Stake Prod Co.,* 77 F.3d 1215, 1233 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Computer Sec. Litig.,* No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608, at *4 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

But Class Counsel believe that Plaintiffs and the Class had very provable claims for liability as to manipulation in violation of the CEA. Defendants' contemporaneous statements combined with other evidence and Plaintiffs' expert evidence would, Plaintiffs believe, establish

or permit the Court to find that all of the elements of a CEA manipulation claim were satisfied.[10] Defendants certainly had countervailing evidence.  Class Counsel would have tried to overcome such evidence.  Thus, proof of liability on the CEA claims was by no means assured.  But Class Counsel's judgment is that Plaintiffs had more than sufficient evidence to establish Defendants' violation of the manipulation provisions of the CEA.

In Class Counsel's judgment, the evidence supported Plaintiffs' antitrust claims under both Sections 1 and 2 of the Sherman Act.  However, Defendants asserted a very substantial defense to the Section 1 claim under the *Copperweld Corp. v. Independence Tube Corporation*, 467 U.S. 752 (1984) intracorporate conspiracy doctrine.  Due to this defense, and others, successfully establishing their claims under Section 1 would have entailed substantial risks.  Although claims for monopoly in violation of Section 2 of the Sherman Act are, in certain circumstances, more difficult to prove than claims under Section 1, Class Counsel's judgment was that the evidence supported establishing Defendants' violations of Section 2.  However, here again, Defendants had significant defenses that, for example, would not have been available to Defendants on the CEA manipulation claims.  These include potential defenses regarding whether Plaintiffs could successfully prove a relevant market, barriers to entry, market share, and other aspects of the Section 2 claim which Defendants asserted were required to be established.  Nonetheless, Class Counsel's best judgment is that Plaintiffs would have been able to establish their antitrust claims.

**Damages.**  With respect to antitrust and CEA manipulation claims, the government does not have the burden of establishing the amount of damages.  Further, the government does not have the burden of establishing impact and damages with respect to antitrust claims.  Plaintiffs,

---

[10] The four elements of a claim for CEA manipulation are: "(1) that the accused had the ability to influence market prices; (2) that [she] specifically intended to do so; (3) that artificial prices existed; and (4) that the accused caused the artificial prices."  *DiPlacido v. CFTC*, 364 Fed. App. 657, 661 (2d Cir. Oct. 16, 2009) (citations omitted).

however, *do* have to establish the foregoing elements in this case.  *In re Crude Oil Commodity Futures Litig.*, 913 F.Supp.2d 41, 61 (S.D.N.Y. 2012)  (Pauley, J.) ("*In re Crude Oil*") ("While Plaintiffs may have a difficult time proving 'actual damages,' that is a fact-intensive inquiry for another day.").

Plaintiffs would have had to prove an intangible – what the prices would have been "but for" the violation.  This determination is very challenging. For example, "the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). Such causation, impact, and damages proof always involves a battle of the experts.  In "such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants," and find that only a fraction of the amount of damages for which Plaintiffs submitted proof are proper.  *See In re Am. Bank Note Holographics, Inc., Sec. Litig.,* 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001).

In  light of these substantial litigation risks, Class Counsel's best judgment is that the cash and non-reversion benefits from this settlement are fair, reasonable, and adequate compared to the risks of continued prosecution, proof of liability at trial, collection of any damages proved, and recovery by each Settlement Class Member of any such collected damages.

**B.    The Notice Plan Should be Approved Because it Provides "The Best Notice Practicable Under the Circumstances"**

**1.    The Legal Standards Governing Notice**

After a class action settlement has been preliminarily approved, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1). When a class is certified for settlement purposes under Rule 23(b)(3), "the

court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In particular, the notice must:

> …clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c).

Fed. R. Civ. P. 23(c)(2)(B).

Notice regarding a proposed settlement is adequate under both Rule 23 and the Due Process Clause if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and it can "be understood by the average class member." *Wal-Mart*, 396 F.3d at 114-15.

### 2. The Proposed Notice Includes All the Requirements of Rule 23(c)(2)(B) and Comports With Due Process

The proposed notice includes, *inter alia*, each of the requirements of Rule 23(c)(2)(B): (i) a description of the action (Persky Decl. Ex. 1-2 at § 2,  pp. 4-7); (ii) a definition of the class (*id*. §§ 5-6, p. 7); (iii) a description of the class claims, issues and defenses (*id*. § 2A, pp. 4-5); (iv) a statement that a class member may enter an appearance through an attorney if the member so desires (*id*. §§ 23-25, pp. 14); (v) a statement that the Court will exclude from the class any member who requests exclusion (*id*., §§ 14-18,  pp. 10-12); (vi) the time and manner for requesting exclusion (*id*.); and (vii) a statement concerning the binding effect of a class judgment on class members (*id*. § 13, pp. 9-10). *Compare* Persky Decl. Ex. 1-2 with Fed. R. Civ. P. 23(c)(2)(B).

The proposed notice also comports with Due Process.  It is well organized, follows the format for class notice promulgated by the Federal Judicial Center, is written in plain and concise language such that it could easily be understood by the average member of the Settlement Class and it fairly apprises the Settlement Class of the existence of the Settlement Agreement, their options under the Settlement Agreement, the material terms of the Settlement Agreement, and how they may obtain a copy of same.

### 3.     The Proposed Notice Plan is the Best Practicable Under the Circumstances

Plaintiffs propose essentially the same program of notice that has been repeatedly approved in prior CEA manipulation class action settlements, *In re Platinum and Palladium Commodities Litig.*, 10 Civ. 3617 (WHP) ("*Platinum and* Palladium"), ECF No. 212 at ¶¶ 7-10 (S.D.N.Y. July 15, 2014); *In re Amaranth Natural Gas Commodities Litig.*, 07-cv-6377 (SAS), (S.D.N.Y. Jan. 13, 2012), ECF No. 376 at ¶¶ 7-10;, *Hershey, et al., v. Pacific Investment Management Company LLC, et al.*, 05-cv-04681 (RAG), (N.D. Ill. Jan. 26, 2011), ECF No. 562 at ¶¶ 2-4, except that this notice (as does the one in *Platinum and Palladium*) also includes publication in The Wall Street Journal, which was not included in those other CEA settlements.

First, Plaintiffs propose to send individual mail notice to all large traders in Class Contracts whose names have been obtained by the Plaintiffs pursuant to a subpoena to the NYMEX.

Second, everyone who transacted in Class Contracts had to do so through a NYMEX clearing broker. Thus, Plaintiffs also propose that mailed notice be given to all clearing brokers on the NYMEX whose names have been obtained by Plaintiffs pursuant to a subpoena to the NYMEX, with the direction that the NYMEX clearing brokers forward the notice to their customers who bought, sold, or held Class Contracts during the Settlement Class Period (or provide the names and addresses of such customers to the Settlement Administrator). This should

result in mail notice to all Settlement Class Members, and provide overlapping notice to the Settlement Class Members who had the largest positions in Class Contracts.

Third, Plaintiffs propose substantial notice by publication. This publication notice includes publishing the short form notice as follows: (a) for two consecutive months in Futures Magazine (which reportedly has 52,000 subscribers and many additional readers who trade commodity futures); (b) on the Futures Magazine website (which reportedly has 115,000 unique visits per month) for one month; (c) for two consecutive months in Technical Analysis of Stocks and Commodities Magazine (which reportedly has approximately 54,540 subscribers); (d) on the Technical Analysis of Stocks and Commodities Magazine website for one month (which reportedly has approximately 100,000 unique visits per month); and (e) in two editions of The Wall Street Journal (which reportedly has a daily average circulation of 1,480,725).  Any members of the Settlement Class that do not receive notice through direct mail are likely to receive notice through the foregoing publications or through word of mouth.

Fourth, Plaintiffs propose to provide notice through the creation of the website www.nymextassettlement.com.  This website will allow Settlement Class Members who search the web to learn of the Action, the proposed settlement, obtain their proof of claim and learn of other pertinent matters (including the date of the Fairness Hearing).

This four-pronged program of notice is reasonably calculated to reach all Settlement Class Members and to reach more than once the largest traders in Class Contracts. Accordingly, the proposed notice plan meets each of the requirements under Rule 23(c)(2)(B), comports with Due Process and is the best notice practicable under the circumstances.

**C.    The Settlement Class Should be Certified for Settlement Purposes Because it Satisfies the Four Requirements of Rule 23(a) and the Two Prongs of Rule 23(b)(3)**

Rule 23(e) allows for settlement "of a certified class."  *Compare* Fed. R. Civ. P. 23(e) with

*In re Global Crossing Securities* 225 F.R.D. at 451 ("[t]he Second Circuit has acknowledged the

propriety of certifying a class solely for settlement purposes…").  A court may grant certification

for settlement purposes where the proposed settlement class satisfies the four prerequisites of

Rule 23(a) (*i.e.*, numerosity, commonality, typicality and adequacy), as well as one of the three

subsections of Rule 23(b).  *Id.*

CEA manipulation claim classes have repeatedly been upheld by the Second Circuit (see

fn. 6  *supra* collecting cases). As demonstrated below, the Settlement Class meets all the

requirements of Rule 23(a) as well as the two prongs of Rule 23(b)(3).

**1.    The Settlement Class Satisfies the Four Requirements of Rule 23(a)**

Rule 23(a) permits an action to be maintained as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

**a.    Rule 23(a)(1)—The Members of the Settlement Class are so Numerous that Joinder of All Members is Impracticable**

Rule 23(a)(1)'s numerosity requirement does not mean that joinder must be impossible, but

rather "merely be difficult or inconvenient, rendering use of a class action the most efficient

method to resolve plaintiffs' claims."  *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 90

(S.D.N.Y. 2009) ("*IPO*").  In fact, numerosity can be presumed at a level of forty class members

or more. *Id.* (citing *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

Here, the Settlement Class consists of all Persons that purchased, sold or held NYMEX Light Sweet Crude Oil futures contracts, NYMEX New York Harbor Heating Oil futures contracts, or NYMEX New York Harbor Gasoline futures contracts at any time from March 2, 2007 through March 26, 2007, inclusive.   Documents produced by the NYMEX reflect that there were, at least, hundreds of traders.  Clearly, joinder of the numerous and geographically dispersed members of the Settlement Class is impracticable. Thus, Rule 23(a)(1) is satisfied.

> **b.** **Rule 23(a)(2)—There Are Numerous Questions of Law and Fact Common To The  Settlement Class**

Rule 23(a)(2) commonality requires that common issues of fact or law affect all class members. *IPO*, 260 F.R.D. at 91. Common issues include, among others:

1.   whether Defendants manipulated NYMEX Crude Oil, New York Gasoline and/or Heating Oil contracts in violation of the CEA;

2.   whether such manipulation caused the pricing of Class Contracts to be artificial;

3.   whether the alleged contract, combination or conspiracy in restraint of trade existed, and, if so, who were the members; and

4.   whether Defendants attempted to monopolize and/or did monopolize the markets for NYMEX Crude Oil, New York Gasoline and/or Heating Oil contracts.

Plaintiffs' overarching allegation is that Defendants manipulated the prices of Class Contracts causing artificial prices which affected all members of the Settlement Class in the same manner. The proof required to establish Defendants' alleged unlawful conduct is common to all members of the Settlement Class. Thus, Rule 23(a)(2) is satisfied.

     **c.**    <u>**Rule 23(a)(3)**</u> **—The Claims and Defenses of the Settlement Class Representatives are Typical of the Claims and Defenses of the Settlement Class**

Typicality may be satisfied under Rule 23(a)(3) where "injuries derive from a unitary course of conduct by a single system." *IPO*, 260 F.R.D. at 91.  The injuries of the proposed Settlement Class representatives are typical of the injuries of the members of the Settlement Class because they arise from the same unitary course of Defendants' alleged manipulative conduct with respect to Class Contracts.  Thus, Rule 23(a)(3) is satisfied.

     **d.**    <u>**Rule 23(a)(4)**</u> **—The Settlement Class Representatives Will Fairly and Adequately Protect the Interests of the Settlement Class**

Rule 23(a)(4) adequacy requires that "the representative parties will fairly and adequately protect the interests of the class."  *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  Generally, courts will consider "whether (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Id.* at 61.

First, the proposed Settlement Class representatives transacted in Class Contracts and were thereby impacted by Defendants' conduct.  The same is true of all members of the Settlement Class.  Thus, the proposed Settlement Class representatives' interests in proving liability and damages are entirely aligned with that of members of the Settlement Class.  Second, the proposed Settlement Class representatives are represented by experienced counsel thoroughly familiar with complex class action and commodities litigation.  *See*, *e.g.*, *In re Natural Gas Commodities Litig*, 231 F.R.D. 171 (S.D.N.Y. 2005) (certifying class alleging commodities manipulation and appointing lawyers from same three firms co-lead counsel).  Thus, Rule 23(a)(4) is satisfied.

### 2.      The Settlement Class Satisfies The Two Prongs of Rule 23(b)(3)

In addition to establishing that the proposed Settlement Class satisfies Rule 23(a)'s

requirements, Plaintiffs must also show that one of three alternative categories under Rule 23(b)

has been established.  *IPO*, 260 F.R.D. at 92.  Plaintiffs move pursuant to Rule 23(b)(3) and

therefore must establish (1) "that the questions of law or fact common to class members

predominate over any questions affecting only individual members . . ." and (2) "…that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).

### a.      Common Questions of Law and Fact Predominate

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation."  *IPO*, 260 F.R.D. at 92.  Here, Plaintiffs allege that

Defendants manipulated the prices of Class Contracts causing artificial prices that affected all

members of the Settlement Class.  Thus, issues common to the members of the Settlement Class

predominate over any individual questions.

### b.      A Class Action is the Superior Method To Adjudicate These Claims

Rule 23(b)(3)'s "superiority" requirement requires a plaintiff to show that a class action is

superior to other methods available for "fairly and efficiently adjudicating the controversy."  *See*

Fed. R. Civ. P. 23(b)(3)(A)-(D) (listing four non-exhaustive factors to consider).

The damages suffered by many of the individual members of the Settlement Class are

likely to be relatively small such that the expense and burden of individual litigation make it

virtually impossible for them to protect their rights.  Moreover, the prosecution of separate

actions by hundreds of individual members of the Settlement Class would impose heavy burdens

upon the Court and would create a risk of inconsistent or varying adjudications of the questions

of law and fact common to the Settlement Class.  For these and other reasons, a class action is

superior to other available methods for fairly and efficiently adjudicating this controversy.  Thus, both prongs of Rule 23(b)(3) are satisfied.

> **D.     The Court Should Appoint Lovell Stewart, Lowey Dannenberg, and Robins Kaplan to Act as Class Counsel for the Settlement Class**

Federal Rule of Civil Procedure 23(g)(1) provides that "a court that certifies a class must appoint class counsel."  Rule 23(g)(1). Rule 23(g)(2) provides that where, as here, only one application is made seeking appointment as class counsel, "the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)."  Fed. R. Civ. P. 23(g)(2).

The Court previously appointed Lovell Stewart, Lowey Dannenberg, and Robins Kaplan as Class Counsel in this Action.  *See* Pre-Trial Order No. 1, as amended by Order substituting Robins Kaplan for Labaton Sucharow LLP, ECF Nos. 15, 46.  For all the same reasons the Court appointed Lovell Stewart, Lowey Dannenberg, and Robins Kaplan as Class Counsel, the Court should now appoint Lovell Stewart, Robins Kaplan, and Lowey Dannenberg as class counsel for the Settlement Class.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement Agreement and enter the Preliminary Approval Order attached as Exhibit 1-1 to the Declaration of Bernard Persky, Esq.

Dated: August 1, 2014                    **LOVELL STEWART HALEBIAN JACOBSON LLP**

/s/ Christopher Lovell
By: Christopher Lovell, Esq.
Ian T. Stoll, Esq.
61 Broadway, Suite 501
New York, New York 10006
212-608-1900

/s/ Geoffrey Horn
**LOWEY DANNENBERG COHEN & HART, P.C.**
Vincent Briganti, Esq.

Geoffrey Horn, Esq.
One North Broadway, 5th Floor
White Plains, New York 10601
914-997-0500

/s/ Hollis Salzman
**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
Hollis Salzman, Esq.
Bernard Persky, Esq.
William V. Reiss, Esq.
601 Lexington Ave., Ste. 3400
New York, New York 10022
212-980-7400

*Interim Co-Lead Counsel*

33